1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,              No.  20-cr-00022-DAD-1

12                 Plaintiff,

13        v.                                ORDER DENYING DEFENDANT'S
                                            MOTIONS TO DISMISS AND SUPPRESS
14   BARTON JOSEPH SLOAN,                    EVIDENCE

15                 Defendant.               (Doc. Nos. 67, 68, 100)

16

17

18        This matter is before the court on defendant Barton Sloan's motions to dismiss Count

19   Three of the indictment brought against him and to suppress evidence seized pursuant to a search

20   of his home on November 7, 2019.[1]  (Doc. Nos. 68, 100.)  Both motions have been fully briefed

21   by the parties.  (Doc. Nos. 67, 68, 78, 80, 85, 86, 91, 92, 95, 99 100, and 101.)  Hearings on these

22   motions were initially held on October 10, 2023 and October 17, 2023.  (Doc. Nos. 88, 97.)  At

23   the latter hearing the court ruled from the bench, denying defendant's motion to dismiss Count

24   Three to the extent that motion was based on the argument that the indictment was insufficient or

---

[1]  Defendant Barton J. Sloan is charged in this case with possession with intent to distribute at
least 1,000 grams of a mixture or substance containing a detectable amount of heroin in violation
of 21 U.S.C. § 841(a)(1) ("Count One"), possession with intent to distribute at least 500 grams of
a mixture or substance containing a detectable amount of methamphetamine in violation of 21
U.S.C. § 841(a)(1) ("Count Two"), and knowingly being a prohibited person in possession of a
firearm in violation of 18 U.S.C. § 922(g)(8) ("Count Three").  (Doc. No. 17 at 1–2.)

25

26

27

28

1    deficient with respect to that count as a matter of law.  (Doc. No. 97.)  A further hearing on the

2    remaining motions, including an evidentiary hearing on the motion to suppress evidence, was

3    held on October 23, 2023.  At that hearing, Assistant United States Attorneys James Conolly and

4    Adrian Kinsella appeared on behalf on the government and attorney Shari Rusk appeared on

5    behalf of defendant.  At the conclusion of the hearing and following further argument from the

6    parties, the remaining motions were taken under submission for decision.  (*Id.*)

7         Below, the court will first address the remaining aspects of defendant's motion to dismiss

8    Count Three before turning to his motion to suppress evidence.

9    **I.      Motion to Dismiss Count Three Charging a Violation of 18 U.S.C. § 922(g)(8)**

10        As noted above, at the October 17, 2023 motions hearing, the undersigned ruled from the

11   bench, denying in part defendant Sloan's motion to dismiss Count Three of the indictment.  In so

12   ruling, the court rejected defendant's argument that Count Three was insufficiently alleged as a

13   matter of law by, among other things, failing to specify or identify the state court order that he

14   allegedly knew of and restrained him, thus rendering his possession of a firearm a violation of 18

15   U.S.C. § 922(g)(8).[2]  (Doc. No. 97) (citing *United States v. Sholley-Gonzalez*, 996 F.3d 887, 894

16   (9th Cir. 2021) and *United States v. Sanchez*, 639 F.3d 101, 1204–05 (9th Cir. 2011)).  At that

17   hearing his counsel clarified that defendant Sloan was also moving to dismiss Count Three on the

18   grounds that 18 U.S.C. § 922(g)(8) has no historical analogue and is therefore unconstitutional

19   under the Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. __,

20   142 S. Ct. 2111, 2125 (2022).  (Doc. No. 100 at 2–4, 9.)  In addition, counsel for defendant Sloan

21   presented another challenge to Count Three as alleged in this case, arguing that the procedures

22   governing issuance of Domestic Violence Restraining Orders (DVROs) in California, such as the

23   November 27, 2012 Criminal Protective Order (CPO) which apparently serves as the basis for

24   Count Three, run afoul of defendant's procedural due process rights as guaranteed by the

---

25   [2]  In recently produced discovery the government provided the defense a state court-issued

26   document purporting to show that defendant was personally served with a copy of a Criminal
     Protective Order prohibiting him from threatening, assaulting, or otherwise harassing a protected

27   person from November 27, 2012, through November 27, 2022.  (Doc. No. 78-1 at 1.)  The
     government argues that this DRVO rendered defendant ineligible to possess a firearm for the

28   duration of the DVRO under 18 U.S.C. § 922(g)(8).  (Doc. No. 78.)

1    Fourteenth Amendment.  (*Id.* at 4–9.)   In opposition to the remaining aspects of defendant's

2    motion to dismiss, the government argues that § 922(g)(8) comports with the nation's historical

3    tradition of firearms regulation and is therefore constitutional under *Bruen*.  (Doc. No. 99.)

4        Below, the court now addresses the two additional arguments advanced by defendant in

5    moving to dismiss Count Three of the indictment.

6        *A.  Whether 18 U.S.C. § 922(g)(8) Violates the Second Amendment*

7        The Second Amendment protects the "individual right to keep and bear arms for self-

8    defense." *Bruen*, 142 S. Ct. at 2125.  To determine if a statute or regulation violates the Second

9    Amendment, the court must first determine if "the Second Amendment's plain text covers an

10   individual's conduct," in which case "the Constitution presumptively protects that conduct." *Id.*

11   at 2129–30.  "The government must then justify its regulation by demonstrating that it is

12   consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.  This second

13   step "requires only that the government identify a well-established and representative historical

14   *analogue*, not a historical *twin*." *Id.* at 2133.

15       Since the Supreme Court's decision in *Bruen*, hundreds of courts have been called upon to

16   consider whether various provisions of 18 U.S.C. § 922(g) violate the Second Amendment.  *See*

17   *United States v. Lewis*, No. 22-cr-00381, 2023 WL 6225329, at *1 (M.D. Tenn. Sept. 25, 2023)

18   ("In the fifteen months since *Bruen* was decided, at least 225 district court opinions have been

19   issued discussing the constitutionality of various subsections of Section 922(g) in light of that

20   case.").  The overwhelming majority of those courts have concluded they do not.  *See, e.g.*,

21   *United States v. Grubb*, No. 23-cr-1014-CJW-MAR, 2023 WL 6960371, at *5 (N.D. Iowa

22   Oct. 20, 2023) ("This Court is not alone in reaching the conclusion that Section 922(g)(3) does

23   not violate the Second Amendment.  Numerous other district courts have reaffirmed the

24   conclusion that Section 922(g)(3) is constitutional after *Bruen*."); *United States v. Cotton*, No. 22-

25   cr-00471, 2023 WL 6465836, at *4 (E.D. Penn. Oct. 4, 2023) (holding "Section 922(g)(1)

26   constitutional on its face"); *Lewis*, 2023 WL 6225329, at *1 ("Once again, the Court finds the

27   particular subsection of 922(g)[3] to be constitutional on its face."); *United States v. Donahue*,

28   /////

3

No. 22-cr-00128-DBT, 2023 WL 4372706 (S.D. Tex. July 5, 2023) (finding § 922(g)(9) to be constitutional).

Indeed, several courts have specifically considered whether 18 U.S.C. § 922(g)(8), the provision alleged to have been violated in Count Three of the indictment in this case, violates the Second Amendment.  Only three courts have found the provision unconstitutional.  *See United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), *cert. granted* 143 S. Ct. 2688 (2023); *United States v. Combs*, __ F. Supp. 3d __, 2023 WL 1466614 (E.D. Ky. Feb. 2, 2023); *United States v. Perez-Gallan*, 640 F. Supp. 3d 697 (W.D. Tex. 2022).  The remaining courts, a large majority of those to consider the issue, have concluded that 18 U.S.C. § 922(g)(8) is constitutional in light of the nation's historical tradition of firearm regulation.  *See United States v. Guthery*, No. 22-cr-00173-KJM, 2023 WL 2696824 (E.D. Cal. Mar. 29, 2023); *United States v. Lewis*, No. 21-cr-00789-NSR, 2023 WL 6066260 at *7 (S.D.N.Y. Sept. 18, 2023); *United States v. Brown*, __ F. Supp. 3d __, 2023 WL 4826846 (D. Utah July 27, 2023); *United States v. Silvers*, __ F. Supp. 3d __, 2023 WL 3232605 (W.D. Ky. May 3, 2023); *United States v. Robinson*, No. 22-cr-00165-RLW, 2023 WL 3167861 (E.D. Mo. May 1, 2023); *United States v. Reuter*, No. 21-cr-00425-RWS-DDN, 2023 WL 3936934 (E.D. Mo. Apr. 24, 2023); *United States v. Kays*, 624 F. Supp. 3d 1262 (W.D. Okla. 2022); *see also United States v. Bena*, 664 F.3d 1180 (8th Cir. 2011) (concluding pre-*Bruen* that § 922(g)(8) is constitutional because it is consistent with the nation's historical common-law tradition).

It appears that in the coming months the Supreme Court will provide further guidance as to the appropriate application of its decision in *Bruen* and the constitutionality of § 922(g)(8).  At this point in time the undersigned does not have anything meaningful to add to the discussion engaged in by the many lower courts addressing the latter issue.  In short, the undersigned simply is persuaded by the analysis of those courts making up the weight of authority on the issue.  Therefore, the court concludes that 18 U.S.C. § 922(g)(8) does not violate the Second Amendment for the reasons ably addressed in *Guthery*, 2023 WL 2696824, at *4–9.

Accordingly, defendant's motion to dismiss the count under § 922(g)(8) will be denied.

/////

1    *B.   Whether California's DVRO Procedure Violates the Fourteenth Amendment*

2          As now clarified, defendant Sloan also moves to dismiss Count Three of the indictment by

3    advancing a facial challenge to the California DVRO procedures under the Due Process Clause of

4    the Fourteenth Amendment.  (Doc. No. 100 at 4.)  In this regard, he argues that California's

5    process for issuing DVROs has limited opportunity for review or substantive hearings, provides

6    defendants with insufficient notice and opportunity to be heard, permits the admission of hearsay

7    evidence, and does not provide defendants with counsel.  (*Id.* at 2–4.)  In making this argument in

8    his motion to dismiss, defendant does not cite to any evidence in the record before this court, nor

9    to any authority suggesting any of these practices authorized under California law violate the

10   Fourteenth Amendment.  (*Id.* at 2–9.)

11         California courts have found that hearings of the type typically conducted in connection

12   with DVRO requests do not violate the Due Process Clause of the Fourteenth Amendment.  *See,*

13   *e.g.*, *In re Marriage of D.S. and A.S.*, 87 Cal. App. 5th 926, 936 (2023) (noting in the context of a

14   procedural due process challenge that "there are instances in which a DVRO request is either

15   unchallenged or the declaration in support of the request, if not materially disputed, so clearly

16   describes abuse under the legal standard that a family court may issue a DVRO after a brief

17   hearing that consists of minimal questioning").  Moreover, a party's lack of counsel in a civil

18   matter similarly does not, as a general matter, constitute a per se violation of the Fourteenth

19   Amendment.  *Lassiter v. Dep't of Social Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27 (1981).

20   Rather, "an indigent litigant has a right to appointed counsel only when, if he loses, he may be

21   deprived of his physical liberty."  *Id.*  Finally, the admission of hearsay evidence, by itself, does

22   not violate the Fourteenth Amendment.  *In re Lucero L.*, 22 Cal. 4th 1227 (2000) (finding that the

23   "argument that the admission of hearsay evidence, per se, is a violation of due process, is without

24   merit" in the context of juvenile dependency hearings).  Indeed, defendant Sloan does not contend

25   that California's DVRO proceedings deny respondents the opportunity to cross-examine hearsay

26   declarants.

27         Defendant also argues that a skewed "incentive structure pervades all civil protective

28   orders in California."  (Doc. No. 100 at 8.)  He contends that if a judge "grant[s] an unwarranted

5

1   restraining order, the worst that will happen is an appeal," whereas if a judge denies a restraining

2   order and violence results, then that judge may face public backlash and a short career. (*Id.*) The

3   court finds this argument unpersuasive. A judgment entered by a court is entitled to a

4   presumption of regularity. *See United States v. Dominguez,* 316 F.3d 1054, 1056 (9th Cir. 2003);

5   *1700 Ocean Ave. Corp. v. GBR Associates*, 354 F.2d 993, 994 (9th Cir. 1965). This "presumption

6   of regularity" is "deeply rooted in our jurisprudence, even when the question is waiver of

7   constitutional rights." *Parke v. Raley*, 506 U.S. 20, 29 (1992). Defendant Sloan has provided no

8   reason why this court should depart from that well-established presumption to, in the absence of

9   any evidence, question the validity of the November 27, 2012 CPO which apparently serves as

10   the basis for the charged violation of § 922(g)(8) in Count Three of the indictment in this case.

11        The court therefore declines defendant's invitation to find that the entire process for

12   issuing DVROs under California law is unconstitutional.   Accordingly, defendant's motion to

13   dismiss Count Three of the Indictment (Doc. Nos. 67, 100) is denied in its entirety.

14        Below, the court turns to address defendant's motion to suppress evidence.

15   **II.        Defendant's Motion to Suppress Evidence Seized Pursuant to Search Warrant**

16        On or shortly before November 1, 2019, Deputy Devin Folk of the Sacramento Sheriff's

17   Department received a citizen tip (likely by email) regarding "foot traffic at all hours of the night"

18   at defendant's residence.[3]  On November 1, 2019, Deputy Folk went to defendant's residence to

19   further investigate this complaint. Deputy Folk had a photograph of defendant Sloan associated

20   with the address in his Department's known persons filed. When he arrived at the address, he

21   saw defendant Sloan walking toward the condominium unit and approached him. Folk was in

22   uniform, identified himself, told defendant Sloan of the complaint of suspicious activity at his

23   address, and asked if he could take a look inside the residence to determine whether there was any

24   substance to the complaint/tip.[4] According to Folk, defendant Sloan appeared to be extremely

---

25   [3]  This factual background is derived from testimony and evidence introduced at the evidentiary

26   hearing conducted on October 23, 2023, as well as from the search warrant affidavit.

27   [4]  Deputy Folk testified that this course of action was consistent with that which he had pursued
     dozens if not hundreds of times in investigating similar vague complaints of suspicious activity

28   received while he was working on his Department's community-oriented policing (POP) team.

nervous at that point, visibly shaking and speaking rapidly, but did consent to Folk entering his residence. Once Deputy Folk entered the condominium, he merely viewed the small common area on the ground floor, saw defendant Sloan's wife and young daughter there and satisfied himself that the area appeared to be normal and raised no concerns. Folk did not search the area, did not open any drawers or cabinets, did not go (or ask to go) upstairs and remained inside the residence only for what he estimated to be two to three minutes. In Folk's experience investigating complaints/tips like this one of people frequently coming and going from an address with a detached garage, as was the case here, the garages are often the source of the complaint. Accordingly, he then asked defendant Sloan if he could see the garage and Sloan agreed, taking him there and opening the garage door for Folk.[5] Once inside the small garage, Folk observed in plain view[6] on the work bench a small digital scale and what he recognized as methamphetamine residue. When asked, defendant Sloan acknowledged that the methamphetamine was his.[7] Based on his experience, Folk believed the garage appeared to be a place where people would use drugs. Folk advised defendant Sloan that what he had in the garage was in line with the complaint the police had received, could result in his family's eviction from the residence, and that he needed to take his "hobby" elsewhere. Defendant Sloan agreed and the two shook hands, with Folk then departing after a little over three minutes inside the garage.

As he was returning to his patrol car, Deputy Folk was contacted by a probation officer who reported that he and other probation officers were observing Sloan's residence in anticipation of seeking a warrant to search it. Deputy Folk, who was unaware of the probation officer's

---

[5] As it turns out defendant Sloan maintained two video cameras in his garage and from the point defendant Sloan opened the garage door for Deputy Folk until Folk departed, their entire interaction was, unbeknownst to Folk at the time, captured on video. That video recording was admitted into evidence at the evidentiary hearing on the pending motion to suppress.

[6] Of course, "the 'plain-view' doctrine does not apply unless the initial entry is lawful, either pursuant to a valid warrant or under one of the recognized exceptions to the warrant requirement." *United States v. Arreguin*, 735 F.3d 1168, 1179 (9th Cir. 2013) (citing *United States* v. *Hotal*, 143 F.3d 1223, 1228 (9th Cir. 1998)); *see also Horton v. California*, 496 U.S. 128, 140 (1990).

[7] As opposed to belonging to another male who apparently was sometimes allowed to stay in the garage and had "stuff" there as well. *See* Evidentiary Hearing Exhibits 2 and 2a.

7

1   investigation, met with the probation officers and provided them the information he had received

2   in the citizen complaint as well as his observations inside the defendant's garage.  Folk also went

3   to the computer in his patrol car and created what is referred to as a CAD report summarizing his

4   interaction with defendant Sloan.  Folk had no further involvement in the investigation.

5           On November 6, 2019, Sacramento County Probation Officer Carlo Cottengim submitted

6   an application for and affidavit in support of the issuance of a search warrant for three residences

7   including defendant Sloan's, as well as two vehicles and the persons of three individuals, again

8   including defendant Sloan, for methamphetamine, currency, and other identified evidence of drug

9   trafficking.  (Doc. No. 68-1 at 2–11.)  The supporting affidavit included only the following with

10  respect to the information purportedly provided to the affiant by Deputy Folk:

> On 11/1/19, I spoke to Sacramento County Sheriff Deputy Devon
> Folk, who stated that he had received a citizen tip regarding Barton
> Sloan who lived at 5313 Manzanita #2.  He stated that the citizen
> informant stated that there was a lot of foot traffic at all hours of the
> night at 5313 Manzanita #2 and suggested that there was narcotics
> activity and/or the selling of stolen property taking place there.
> Deputy Folk stated that he had contacted Sloan earlier that day as
> Sloan was walking near 5313 Manzanita and Shadow Creek Lane
> with a package.  Sloan confirmed that he lived at the residence and
> allowed the officer inside the apartment.  Once inside Sloan stated
> that he had a friend stay a lot with him and pointed the officer to the
> garage area where the officer observed a futon and a table.  On the
> table the officer observed that there was a digital scale with what he
> believed to be methamphetamine residue.  Sloan stated that the
> scale was his and stated that he occasionally used meth.  Officer
> Folk also contacted Christina "Chrissy" Sloan inside the residence.

20  (Doc. No. 68-1 at 11.)

21          The probation officer's brief search warrant affidavit can be fairly characterized as

22  focusing on evidence establishing probable cause to believe that probationer David Hansen (who

23  was on mandatory supervision following his conviction for possession of a controlled substance

24  for sale) was evading supervision, providing his probation officer false information as to his

25  living address and vehicle, and was continuing to engage in drug trafficking.  (*Id*. at 9–13.)

26  Indeed, based on surveillance and other investigation the affidavit related information placing

27  Hansen for extended periods of time at residences on Spanish Corral Lane in Auburn, CA and

28  Mariposa Avenue in Citrus Heights, CA.  (*Id.* at 10–12.)  At the latter location surveillance

1   observations were reported in the affidavit establishing reason to believe that Hansen and an

2   individual named Buddy Beddo were conducting hand to hand drug transactions at that address.

3   (*Id*. at 11–12.)

4          With respect to defendant Sloan and his residence on Manzanita Avenue, in addition to

5   the information provided by Deputy Folk (set forth in its entirety above), that affidavit provided

6   only the following:  (1) On September 27, 2019, Hansen provided his probation officer with his

7   new cell phone number which Hansen said would be his contact number for at least the next year,

8   and that cell phone was later determined to be subscribed and registered to defendant Sloan at the

9   Manzanita Avenue address; (2) a tracking device placed on Hansen's vehicle indicated that it was

10   near Sloan's Manzanita Avenue address from 7:30 p.m. until 9:12 p.m. on September 6, 2019;

11   and (3) between October 24, 2019 and November  6, 2019, location information for Hansen's

12   new cell phone obtained by search warrant placed him at what was characterized as "three

13   primary locations"—Spanish Corral Lane, Manzanita Avenue and Mariposa Avenue.  (*Id.* at 11.)

14   Finally, the supporting affidavit stated that based upon his training and experience the affiant

15   knew that, among other things, "sellers of methamphetamine commonly use digital or mechanical

16   scales to properly weigh their narcotics, when purchasing and selling specific amounts."  (Doc.

17   No. 68-1 at 13.)

18          The search warrant for the three residences, the three individuals and two vehicles was

19   authorized by a Sacramento County Superior Court Judge on November 6, 2019.  The search

20   warrant was executed on November 7, 2019.  At defendant Sloan's Manzanita Avenue residence

21   and garage the executing officers found and seized 1.7 kilograms of methamphetamine, 1.8

22   kilograms of heroin, various drug paraphernalia, and a loaded 9 mm pistol.

23          On September 25, 2023, defendant Sloan moved to suppress the evidence seized pursuant

24   to the search warrant from his residence and garage.  (Doc. No. 68 at 2.)  Specifically, defendant

25   Sloan contends that key evidence supporting the issuance of the search warrant for that location

26   was obtained pursuant to Deputy Folk's warrantless entry into his residence in violation of the

27   Fourth Amendment.  (Doc. Nos. 68 at 10; 85 at 6–9.)  Defendant contends that once the evidence

28   discovered pursuant to that warrantless entry is purged from the search warrant affidavit, probable

cause to search the Manzanita Avenue residence was lacking and the evidence seized pursuant to the tainted warrant must be suppressed.  (Doc. Nos. 68 at 10, 14; 85 9–10.)  Defendant Sloan also argues that even if Deputy Folk's observations were not unlawfully obtained, the supporting affidavit still failed to establish probable cause to believe that evidence of a crime would be found at the Manzanita Avenue residence.  (Doc. No. 68 at 3–14).[8]

In opposition, the government argues that because Deputy Folk's entry into defendant's home on November 1, 2019, was undertaken pursuant to defendant's consent, Folk's observations set forth in the affidavit were properly relied upon by the issuing judge in making the probable cause determination.  (Doc. No. 80 at 9–10.)  The government also argues that, even if Deputy Folk's observations were removed from the affidavit, probable cause supporting the issuance of the search warrant was established.  (*Id.* at 10.)  Finally, the government argues that even were the search warrant found to be defective, the good faith exception to the exclusionary rule applies here because the searching officers reasonably relied on the sufficiency of the warrant.  (*Id.* at 11–12.)  In reply, defendant reiterates his arguments from his motion to suppress and argues that the good faith exception does not apply when a search warrant is issued on the basis of evidence obtained as a result of an unlawful warrantless search.  (Doc. No. 85.)

Below the court will first address whether the government has established that an exception to the warrant requirement applies to Deputy Folk's entry into defendant's  residence and garage.  The court will then turn to the probable cause challenge and the potential application of the good faith exception to the exclusionary rule under the facts of this case.

*A.  Whether the Government Has Shown That An Exception to the Warrant Requirement*
   *Applied to Deputy Folk's Entry into Defendant Sloan's Residence*

It is well settled that "[w]arrantless searches by law enforcement officers 'are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'"  *United States v. Cervantes*, 703 F.3d 1135, 1138–39 (9th Cir.

---

[8]  The court notes that the defense has not mounted a challenge under *Franks v. Delaware*, 438 U.S. 154 (1978) to the veracity of the affidavit submitted in support of the issuance of the search warrant.

2012) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  "It is equally well settled that

one of the specifically established exceptions to the requirements of both a warrant and probable

cause is a search that is conducted pursuant to consent."  *Schneckloth v. Bustamonte*, 412 U.S.

218, 219 (1973); *see also Georgia v. Randolph*, 547 U.S. 103, 109 (2006).  The consent exception

requires the individual to give "voluntary and intelligent consent to a warrantless search of his

person, property, or premises."  *United States v. Cormier*, 220 F.3d 1103, 1112 (9th Cir. 2000)

(quoting *United States v. Torres-Sanchez*, 83 F.3d 1123 (9th Cir. 1996)).  "In order to establish

the validity of a consent to search, the government bears the heavy burden of demonstrating that

the consent was freely and voluntarily given."  *United States v. Chan-Jimenez*, 125 F.3d 1324,

1327 (9th Cir. 1997) (citing *Schneckloth*, 412 U.S. at 222); *see also United States v. Russell*, 664

F.3d 1279, 1281 (9th Cir. 2012); *Pavao v. Pagay*, 307 F.3d 915, 918–19 (9th Cir. 2002).  The

government's burden in this regard is to establish by a preponderance of the evidence that consent

to search was voluntary.  *United States v. Matlock*, 415 U.S. 164, 177 (1974); *United States v.

Bautista*, 362 F.3d 584, 589 (9th Cir. 2004).  "That burden is heaviest when consent would be

inferred to enter and search a home . . . ."  *United States v. Little Dog*, 760 Fed. App'x. 502, 503

(9th Cir. 2019)[9] (quoting *United States v. Shaibu*, 920 F.2d 1423, 1426 (9th Cir. 1990)); *see also

United States v. Impink*, 728 F.2d 1228, 1232 (9th Cir. 1984) (noting that this is because consent

"is not lightly to be inferred").  "The consent must be unequivocal and specific and freely and

intelligently given.  There must be convincing evidence that defendant has waived his rights. . . .

Courts indulge every reasonable presumption against waiver of fundamental constitutional

rights."  *Shaibu*, 920 F.2d at 1426 (internal quotations omitted); *see also United States v. Basher*,

629 F.3d 1161, 1167–68 (9th Cir. 2011); *United States v. Page*, 302 F.2d 81, 83–84 (9th Cir.

1992).  However, the Ninth Circuit has also explained as follows:

> We recognize that "every encounter has its own facts and its own
> dynamics," and "[s]o does every consent."  *United States v.
> Morning*, 64 F.3d 531, 533 (9th Cir.1995).  In determining whether
> consent was given in a particular case, we must therefore consider
> the totality of the circumstances.  *See Schneckloth v. Bustamonte*,

---

[9]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit
Rule 36-3(b).

1

412 U.S. 218, 225–26, 93 S. Ct. 2041, 36 L.Ed.2d 854 (1973);
*United States v. Garcia*, 997 F.2d 1273, 1281–82 (9th Cir. 1993).
"[I]t is only by analyzing all the circumstances of an individual
consent that it can be ascertained whether in fact it was voluntary."
*Schneckloth*, 412 U.S. at 232–33, 93 S. Ct. 2041.

2

3

4 *Pavao*, 307 F.3d at 919; *see also Impink*, 728 F.2d at 1234.

5 In assessing the voluntariness of consent the Ninth Circuit has focused "on five non-

6 exclusive factors: '(1) whether defendant was in custody; (2) whether the arresting officers had

7 their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the defendant was

8 notified that [he] had a right not to consent; and (5) whether the defendant had been told a search

9 warrant could be obtained.'"  *United States v. Taylor*, 60 F.4th 1233, 1243 (9th Cir. 2023)

10 (quoting *Basher*, 629 F.3d at 1168).  "Nevertheless, these factors are only guideposts, not a

11 mechanized formula to resolve the voluntariness inquiry."  *United States v. Patayan Soriano*, 361

12 F.3d 494, 502 (9th Cir. 2004).

13 Consideration of the five non-exclusive factors weigh in favor of a finding that defendant

14 Sloan's consent to Deputy Folk's entry into his residence, including the garage, was voluntarily

15 given.  First, defendant Sloan was clearly not in custody.  Second, although he was of course in

16 uniform and armed, Deputy Folk never drew his weapon or suggested in any way through his

17 actions that his service revolver would be employed at any point during his interaction with

18 defendant.[10]  Third, "*Miranda* warnings were inapposite since [defendant] was not in custody."

19 *Patayan Soriano*, 361 F.3d at 504; *see also Taylor,* 60 F.4th at 1243.  Fourth, Deputy Folk in no

20 way intimated that he could return with a search warrant if defendant Sloan refused to consent.

21 *See Taylor,* 60 F.4th at 1243 ("These factors all suggest that Taylor's consent was voluntary.")

22 Fifth, and finally, Deputy Folk testified that he could not recall whether he let defendant Sloan

23 know that he had the right not to consent to the deputy's entry.  As to this final factor, the court

24

25

26

27

28

[10]  At the evidentiary hearing defendant's counsel suggested through cross-examination that, during his brief time in the garage with defendant Sloan, Deputy Folk had his hand on his revolver.  Deputy Folk explained that he was merely resting his hand on the hood of his holstered revolver at one point.  Any possible suggestion that this was an intimidating gesture by Deputy Folk is, in the court's view, completely rebutted by the video evidence.  *See* Evidentiary Hearing, Ex. 2.  In short, other than the presence of a uniformed deputy sheriff, there was absolutely nothing intimidating about this interaction.

1    notes that the government is not required to prove that defendant Sloan "knew he had a 'right to

2    refuse consent' as a 'necessary prerequisite to demonstrating a "voluntary" consent.'" *Taylor*, 60

3    F.4th at 1243 (quoting *Schneckloth*, 412 U.S. at 232–33). Nevertheless, where officers fail to

4    inform one of the right not to consent it is "at least a factor that weighs against voluntariness." *Id*.

5    (citing *Basher*, 629 F.3d at 1168). Here, Deputy Folk testified he may or may not have so

6    advised defendant Sloan, he simply could not remember. Because the burden to establish

7    voluntariness of consent is borne by the government, the court will consider this factor as

8    weighing against a finding of voluntariness.[11] Even so, consideration of the majority of the five

9    non-exclusive factors here weighs in favor of a finding that Sloan's consent to enter was

10   voluntarily given.

11        Moreover, as noted above, because every consent has its own facts and dynamics in

12   making the determination of whether voluntary consent was given in a particular case the court

13   must consider the totality of the circumstances. *Schneckloth*, 412 U.S. at 232–33 ("[I]t is only by

14   analyzing all the circumstances of an individual consent that it can be ascertained whether in fact

15   it was voluntary."); *Pavao*, 307 F.3d at 919. The undersigned found Deputy Folk's testimony

16   regarding defendant Sloan's voluntary consent to his entry into the residence and garage to be

17   entirely credible. It has been suggested that Deputy Folk had little recollection of the events in

18   question and therefore based his evidentiary hearing testimony almost solely on his review of the

19   garage video and his summary entries made on the computer in his patrol car. However, the court

20   found his testimony to be credible in this regard as well. It is true that Deputy Folk did not recall

21   the exact words he spoke to defendant Sloan on November 6, 2019, nor every detail of the citizen

22   complaint or steps he took before going to defendant's address that day. This is not at all

23   surprising given that his testimony was being provided almost four years after his interaction with

24   defendant Sloan, the interaction was typical of many he had in the ordinary course of his duties at

25   the time, and this interaction itself took place over the course of only approximately ten minutes.

26   However, while he could not recall all of the words he spoke during those ten minutes, Deputy

27

28   [11] It was established at the evidentiary hearing that no written form consenting to the warrantless
     entry was used by Deputy Folk.

1    Folk was clear in his testimony about the following:  he told defendant Sloan generally about the

2    nature of the citizen complaint of suspicious activity at his residence and that that was why he,

3    Folk, was there; Sloan was shaking, spoke rapidly and appeared to be extremely nervous; Folk

4    asked Sloan if he could come inside his residence to take a look around in order to dispel any

5    suspicion raised by the complaint and Sloan consented to his entry; after viewing the lower level

6    living area of the residence and seeing nothing out of the ordinary, Folk asked Sloan if he could

7    look around the garage and Sloan consented; Sloan went with Folk to the garage and opened the

8    door for him; during his approximately three and a half minutes in the small garage, Deputy Folk

9    saw on the work bench and in plain view[12] a small digital scale and what he recognized as

10    methamphetamine residue next to it; after advising Sloan that he was risking his family's eviction

11    from their residence and needed to take his "hobby" elsewhere, Folk left the residence; his

12    encounter with defendant Sloan was consensual and everything Sloan did during that brief

13    encounter was voluntary; and as he was returning to his patrol car Folk was contacted by the

14    probation officers, learned of their investigation and met with them to share the information he

15    had just obtained.  Moreover, at least as to the three-and-a-half-minute portion of the encounter

16    taking place in the garage, the video footage from defendant Sloan's cameras corroborates

17    Deputy Folk's testimony.

18       Defendant Sloan has argued that the government has not met its burden of showing that

19    Deputy Folk requested and received permission to enter defendant's home, suggesting that

20    Deputy Folk approached him on the street, and then "followed Mr. Sloan to the apartment, past

21    the curtilage, and into the house."  (Doc. No. 68 at 9.)  Based upon this scenario, the defense

22    contends that this case is governed by the decision in *Shaibu*, 920 F.2d at 1427, in which the court

23

24    ──────────

[12] "Where the initial intrusion that brings the police within plain view of such an article is
supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement,
the seizure is also legitimate."  *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971); *see also*

25    *Kentucky v. King*, 563 U.S. 452, 462–63 (2011) ("[W]e have held that law enforcement officers
may seize evidence in plain view, provided that they have not violated the Fourth Amendment in

26    arriving at the spot from which the observation of the evidence is made."); *United States v.*

27    *Cornejo*, 598 F.2d 554, 556 (9th Cir. 1979) ("The remaining items, including appellant Reyes'
purse, were also legitimately seized since they were discovered in plain view during the course of

28    the lawful consent search.")

found consent lacking "where officers followed [the] defendant through [an] open door as he reentered [his] apartment." (*Id.* at 10.)  Yet, the defense presented no evidence supporting these arguments, either in the form of declarations or live testimony from defendant Sloan or his wife who was present at the time of Deputy Folk's visit.  Thus, the court is left solely with the evidence presented by the government which the court finds to be sufficient.  This is a case where consent to enter and view was affirmatively given, not one in which consent must be inferred. For these reasons, the court concludes the government has established by a preponderance of the evidence that defendant Sloan voluntarily consented to Deputy Folk's entry into the residence and the garage.[13]  *See Taylor*, 60 F.4th at 1243 (affirming the district court's finding of voluntary consent where "officers asked for consent while the suspect was not in custody, they did not have guns drawn, and they made no mention of *Miranda*, search warrants, or the suspect's right to refuse consent" and "the entire interaction was calm[ ] and could even be described as friendly") (citing *Basher*, 629 F.3d at 1168 and *United States v. Kim*, 25 F.3d 1426, 1432 (9th Cir. 1994)).

Therefore, Deputy Folk's observations inside defendant Sloan's garage may properly be considered in determining whether the search warrant for the Manzanita Avenue residence was supported by the required showing of probable cause.

B.  *Whether the Supporting Affidavit Established Probable Cause For the Issuance of the Search Warrant for Defendant Sloan's Residence*

As noted above, defendant Sloan also argues that even if Deputy Folk's observations were lawfully obtained and properly considered, probable cause for the issuance of the search warrant for his residence was still lacking and the evidence seized from that location should be suppressed.  (Doc. No. 68 at 12–14.)

"A [search] warrant must be supported by probable cause—meaning a 'fair probability that contraband or evidence of a crime will be found in a particular place based on the totality of

---

[13]  The evidence before the court also establishes that Deputy Folk limited his actions inside the residence and garage to the scope of the consent given by defendant Sloan, i.e., to "look around" in those areas.  *See Kraus v. Pierce Cnty.*, 793 F.2d 1105, 1110 (9th Cir. 1986) ("[T] here is no allegation that the deputies rifled through any of the Kraus' possessions or opened any doors, drawers, or cabinets.")

circumstances.'"  *United States v. Kvashuk*, 29 F.4th 1077, 1085 (9th Cir. 2022) (quoting *United States v. King*, 985 F.3d 702, 707 (9th Cir. 2021)); *see also Illinois v. Gates*, 462 U.S. 213, 238 (1983) (probable cause is satisfied where "there is a fair probability that contraband or evidence of a crime will be found in a particular place."); *United States v. Struckman*, 603 F.3d 731, 739 (9th Cir. 2010).  The probable cause standard does not require a court "to believe to an absolute certainty, or by clear and convincing evidence, or even by a preponderance of the available evidence, that [a suspect] had committed a crime."  *United States v. Lopez*, 482 F.3d 1067, 1078 (9th Cir. 2007); *see also United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc).

The probable cause showing made in the supporting affidavit as to the search of defendant Sloan's residence was, in the undersigned's view, far from robust.   As reviewed above (*infra* at 9), the six-page search warrant affidavit established that David Hansen was a person on mandatory probation supervision after his most recent conviction for possession of a controlled substance for sale.  (Doc. No. 68-1 at 9.)  It also recited facts supporting a reason to believe that Hansen was evading supervision and providing his probation officer with false information about where he was living and the vehicle he was driving.  (*Id.* at 10.)  Additional facts set forth in the affidavit provided the basis for a reasonable belief that Hansen and Buddy Beddo were conducting hand to hand drug transactions at a residence located on Spanish Corral Lane in Auburn, CA.  (*Id.* at 11–12.)  However, with respect to defendant Sloan and his residence on Manzanita Avenue, the affidavit provided only the following:  (1) On September 27, 2019, Hansen provided his probation officer with his new cell phone number that was later found to be subscribed and registered to defendant Sloan at the Manzanita Avenue address; (2) a tracking device placed on Hansen's vehicle indicated that it was near Sloan's Manzanita Avenue address from 7:30 p.m. until 9:12 p.m. on September 6, 2019; (3) between October 24, 2019 and November 6, 2019, location information for Hansen's new cell phone placed him at, according to the affiant, "three primary locations"—Spanish Corral Lane, Manzanita Avenue and Mariposa Avenue; (4) Deputy Folk's report of a citizen tip regarding Barton Sloan who lived at 5313 Manzanita #2 where there was heavy foot traffic at all hours of the night, Folk's observation of a digital scale and methamphetamine residue in Sloan's garage, and Sloan's admission to Folk that

16

1   the methamphetamine was his; and (5) the affiant's statement that based upon his training and

2   experience "sellers of methamphetamine commonly use digital or mechanical scales to properly

3   weigh their narcotics, when purchasing and selling specific amounts." (*Id.* at 11–13.)

4          Absent the inclusion of Deputy Folk's observations inside defendant Sloan's garage a

5   persuasive argument could perhaps be made that the affidavit established no more than a

6   suspicion of illegal activity based on the sole citizen complaint of heavy foot traffic during the

7   night and Sloan's apparent association with Hansen, but failed to establish probable cause to

8   believe that evidence of a crime would be found at Sloan's Manzanita Avenue residence.

9   However, the addition of Deputy Folk's observation of the digital scale and methamphetamine

10  residue, which Sloan admitted was his, inside the garage of the residence along with the statement

11  of expertise by the affiant that sellers of methamphetamine commonly possess and use such

12  scales, was sufficient to establish a fair probability that contraband or evidence of a crime would

13  be found at defendant Sloan's Manzanita Avenue residence.

14         Accordingly, defendant's contention that the affidavit submitted in support of the search

15  warrant for his residence failed to establish the requisite probable cause is rejected.

16      C.  Application of the Good Faith Exception to the Exclusionary Rule

17         Finally, even if the probable cause showing in the supporting affidavit were found to be

18  lacking as to defendant Sloan's residence, suppression of the evidence seized would not be

19  appropriate in light of the good faith exception to the exclusionary rule. That is because, as

20  explained below, although the showing of probable cause relating to that residence was not

21  robust, it was also not bare bones and the executing officers were entitled to rely upon the

22  issuance of the warrant by the state court judge.

23         "The good-faith exception precludes suppression of evidence seized by officers who acted

24  'in objectively reasonable reliance' on a search warrant that is later declared invalid." *United*

25  *States v. Artis*, 919 F.3d 1123, 1133 (9th Cir. 2019) (quoting *United States v. Leon*, 468 U.S. 897,

26  922 (1984)).[14]  The Supreme Court in *Leon* "identified four situations that per se fail to satisfy the

27

28  ---
    [14]  "The government bears the burden of showing that the good-faith exception applies." *Artis*,
    919 F.3d at 1134 (citing *Underwood*, 725 F.3d at 1085).

good faith exception." *United States v. Underwood*, 725 F.3d 1076, 1085 (9th Cir. 2013); *see also United States v. Barnes*, 895 F.3d 1194, 1201 (9th Cir. 2018). One such circumstance is "where the affidavit is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[.]'" *Underwood*, 725 F.3d at 1085 (quoting *Leon*, 468 U.S. at 922–23. As the Ninth Circuit has explained,

> An affidavit is so lacking in indicia of probable cause, or bare bones, when it fails to provide a colorable argument for probable cause. *United States v. Hove*, 848 F.2d 137, 139–40 (9th Cir.1988). A colorable argument is made when "thoughtful and competent judges" could disagree that probable cause does not exist. *Id.* at 139 (internal quotations omitted).

*Id.*; *see also United States v. Crews*, 502 F.3d 1130, 1136 (9th Cir. 2007).

Above, the court has concluded that the affidavit (with the information provided by Deputy Folk regarding his observations inside the garage included) established probable cause to believe that evidence of a crime would be found at defendant Sloan's residence. The same reasons supporting that conclusion necessarily support a finding that the supporting affidavit provided a colorable argument for probable cause and that the officers executing the search warrant at that location were reasonably entitled to rely on the judge's issuance of the warrant. Therefore, the good faith exception to the exclusionary rule provides an alternative ground upon which defendant's motion to suppress evidence must be denied.

## CONCLUSION

For the reasons set forth above, defendant's motion to dismiss Count Three of the Indictment (Doc. No. 100), is denied in its entirety. Defendant's motion to suppress all evidence seized pursuant to the search warrant executed at his residence on November 7, 2019 (Doc. No. 68), is also denied.

IT IS SO ORDERED.

Dated: __**November 14, 2023**__ _____

DALE A. DROZD
UNITED STATES DISTRICT JUDGE

18